**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 12-2102**

───────────

METROPOLITAN REGIONAL INFORMATION SYSTEMS, INC.,

        Plaintiff - Appellee,

    v.

AMERICAN HOME REALTY NETWORK, INC.,

        Defendant – Appellant,

    and

JONATHAN J. CARDELLA; NATIONAL ASSOCIATION OF REALTORS,

        Defendants.

------------------------

CONSUMER ADVOCATES IN AMERICAN REAL ESTATE,

        Amicus Supporting Appellant.

───────────

**No. 12-2432**

───────────

METROPOLITAN REGIONAL INFORMATION SYSTEMS, INC.,

        Plaintiff – Appellee,

    v.

AMERICAN HOME REALTY NETWORK, INC.,

        Defendant – Appellant,

    and

JONATHAN J. CARDELLA; NATIONAL ASSOCIATION OF REALTORS,

Defendants.

------------------------

CONSUMER ADVOCATES IN AMERICAN REAL ESTATE,

Amicus Supporting Appellant.

---

Appeals from the United States District Court for the District of Maryland, at Greenbelt.  Alexander Williams, Jr., District Judge.  (8:12-cv-00954-AW)

---

Argued: May 15, 2013                    Decided: July 17, 2013

---

Before TRAXLER, Chief Judge, and GREGORY and DUNCAN, Circuit Judges.

---

Affirmed by published opinion.  Judge Duncan wrote the opinion, in which Chief Judge Traxler and Judge Gregory joined.

---

**ARGUED:** Peter Farkas, FARKAS & TOIKKA LLP, Washington, D.C., for Appellant.  Margaret Aldona Esquenet, FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Washington, D.C., for Appellee. **ON BRIEF:** Richard S. Toikka, FARKAS & TOIKKA LLP, Washington, D.C.; Christopher R. Miller, Chief Legal Officer and General Counsel, AMERICAN HOME REALTY NETWORK, INC., San Francisco, California, for Appellant.  John T. Westermeier, FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Reston, Virginia, for Appellee.  Douglas R. Miller, Executive Director and Attorney, CONSUMER ADVOCATES IN AMERICAN REAL ESTATE, Navarre, Minnesota, for Amicus Supporting Appellant.

---

DUNCAN, Circuit Judge:

Appellant American Home Realty Network, Inc. ("AHRN") and Appellee Metropolitan Regional Information Systems, Inc. ("MRIS") are competitors in the real estate listing business. MRIS offers an online fee-based "multiple listing service" to real estate brokers and agents, while AHRN circumvents those brokers and agents by taking listing data from online database compilers like MRIS and making it directly available to consumers on its "real estate referral" website.

In this action, MRIS contends that AHRN's unauthorized use of its copyrighted material constitutes infringement under the Copyright Act. The district court entered a preliminary injunction order prohibiting AHRN's display of MRIS's photographs on AHRN's referral website, and AHRN appealed. For the reasons that follow, we affirm.

I.

A.

MRIS operates an online multiple listing service, commonly known as an "MLS," in which it compiles property listings and related informational content (the "MRIS Database"). MRIS offers this service to real estate broker and agent subscribers in Maryland, Virginia, the District of Columbia, and parts of Delaware, West Virginia, and Pennsylvania.

3

Upon payment of a subscription fee to MRIS and assent to terms, subscribers upload their real estate listings to the MRIS Database and agree to assign to MRIS the copyrights in each photograph included in those listings. In relevant part, the MRIS Terms of Use Agreement ("TOU") reads as follows:

> All images submitted to the MRIS Service become the <u>exclusive property</u> of [MRIS]. By submitting an image, you hereby <u>irrevocably assign</u> (and agree to assign) to MRIS, free and clear of any restrictions or encumbrances, all of your rights, title and interest in and to the image submitted. This assignment includes, without limitation, all worldwide copyrights in and to the image, and the right to sue for past and future infringements.

J.A. 464[1] (emphasis added). In order to submit photographs to the MRIS Database, the subscriber must click a button to assent to the TOU.[2] In exchange, subscribers are granted access to all of the real estate listings in the MRIS Database (including competitors' listings) and a nonexclusive license to display those listings on their own brokerage and/or agency websites via data feed.

To protect its claims of copyright ownership in the MRIS Database, MRIS affixes its mark and copyright notice--e.g., "©

---

[1] Citations to "J.A." throughout this opinion refer to the Joint Appendix filed in the initial appeal, while "S.J.A." refers to the Supplemental Joint Appendix filed in the second, consolidated appeal.

[2] The record is not clear as to the precise manner in which the TOU appears to subscribers.

2012 MRIS"--to all photographs published in the MRIS Database, and registers the MRIS Database with the Copyright Office each quarter under the registration procedures applicable to automated databases. See J.A. 460.[3] For example, one application from 2008 reads, in pertinent part:

Type of Work: Computer File

Application Title: Group registration for automated database titled Metropolitan Regional Information Systems, Inc. MRIS Database; unpublished updates from September 1, 2007 to December 31, 2007.

Authorship on Application: [MRIS], employer for hire[.]

Pre-existing Material: Previous versions of unpublished automated database updated and revised from September 1, 2007 to December 31, 2007.

Basis of Claim: Daily updated and revised text and images and new text and images.

Copyright Note: Regarding deposit: Application states that ID material (database records) from representative date December 31, 2007.

J.A. 426. Other applications list "text," or "text, photographs," as pre-existing material or the basis of the claim. See, e.g., J.A. 428-30. According to MRIS, its quarterly registrations of the MRIS Database "extend to the

_____

[3] See also J.A. 158-67, 426-30 (copies of registration applications spanning the period from October 1, 2003 to December 31, 2011); J.A. 406-25, 431-58 (corresponding certificates of registration). As AHRN notes, these registration certificates do not identify the names of any of the authors or titles of individual photographs. See Appellant's Br. at 42.

collection and compilation of the real estate listings in the MRIS Database and to expressive contributions created by MRIS or acquired by MRIS, including the photographs included in the listings." J.A. 460.

AHRN is a California real estate broker that owns and operates the website NeighborCity.com, a national real estate search engine and referral business. Among other sources, AHRN acquires the data displayed on NeighborCity.com from real estate brokers and agents, county tax assessors' offices and other public records, foreclosure data providers, and multiple listing services such as the MRIS Database. AHRN expressly disclaims any role in the creation of the data it makes available: the terms of use for NeighborCity.com provide that the user understands "all the data on properties available for sale or rent is maintained by various . . . MLSs" and that AHRN "does not alter or add to this information on the properties in any way." J.A. 360. That AHRN has displayed on NeighborCity.com real estate listings containing copyrighted photographs taken from the MRIS Database is not presently disputed.

B.

On November 18, 2011, MRIS sent AHRN a cease and desist letter. In response, AHRN suggested the parties develop a "custom license" whereby AHRN could continue to use the listing data to which MRIS claimed a proprietary interest. MRIS

6

rejected that idea and, on March 28, 2012, filed suit against AHRN and its CEO, Jonathan Cardella,[4] alleging various claims related to copyright infringement. A few days later, MRIS sought a preliminary injunction under the Copyright Act, which authorizes a federal court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). AHRN moved to dismiss for lack of personal jurisdiction, improper venue, and failure to state a claim. The district court denied AHRN's motion to dismiss, and granted MRIS's motion for preliminary injunction. See 888 F. Supp. 2d 691 (D. Md. 2012). AHRN timely appealed.

In response to motions filed by the parties, the district court revised its preliminary injunction order while the appeal was still pending.[5] The revised order specifies that the court enjoins only AHRN's use of MRIS's photographs--not the compilation itself or any textual elements that might be considered part of the compilation--and also renders the injunction's effect conditional upon MRIS's posting of security.

---

[4] The district court dismissed Cardella from the action for lack of personal jurisdiction. He is not party to this appeal.

[5] Specifically, the district court granted AHRN's motion for clarification, granted in part MRIS's motion for modification, and denied AHRN's motion for reconsideration or suspension.

See 904 F. Supp. 2d 530 (D. Md. 2012). AHRN again appealed, and the two appeals were consolidated. We thus review AHRN's remaining challenges to the district court's revised preliminary injunction order.[6]

## II.

We review the district court's decision to grant a preliminary injunction for abuse of discretion, assessing its factual determinations for clear error and its legal conclusions de novo. Pashby v. Delia, 709 F.3d 307, 319 (4th Cir. 2013) (citing Aggarao v. MOL Ship Mgmt. Co., 675 F.3d 355, 366 (4th Cir. 2012)). Parties seeking a preliminary injunction must demonstrate that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

AHRN argues that MRIS has failed to show a likelihood of success on its copyright infringement claim primarily for two reasons: (1) when MRIS registered its Database it failed to

---

[6] Following the district court's entry of the revised order, AHRN withdrew the objections raised in its first appeal to the order's lack of specificity and failure to require security. See Appellant's Supp. Br. at 2.

8

properly register its copyright in the individual photographs; and (2) MRIS does not possess copyright interests in the photographs because the subscribers' electronic agreement to MRIS's terms of use failed to transfer those rights.[7]

We note at the outset that our consideration of the parties' arguments is complicated by their conflation of copyright protection and copyright registration. These are two entirely distinct matters, governed by separate sections of the Copyright Act. Compare 17 U.S.C. § 102, with 17 U.S.C. §§ 408-412. Unlike registration, which we discuss at length below, the scope of copyright protection is not at issue in this appeal. The district court's revised order enjoins only the use of photographs uploaded by MRIS's subscribers, and AHRN does not contest that these photographs of homes and apartments are worthy of copyright protection.[8] To the extent AHRN argues that

---

[7] AHRN also challenges the district court's evaluation of the second, third, and fourth prongs of the preliminary injunction analysis. Because we find AHRN's arguments in this regard to be without merit, and because they are largely factual inquiries to which we afford substantial deference to the district court, we reject them without further discussion here.

[8] Nor could it reasonably do so. "For more than a century photographs have been held to be copyrightable 'writings' under Article I, § 8 of the Constitution." Rogers v. Koons, 960 F.2d 301, 306 (2d Cir. 1992) (citation omitted). This is so even when they are largely "factual," rather than artistic, in nature. See Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 60-61 (1884) (recognizing wide copyright protection over photographs in holding that a photograph of Oscar Wilde was an (Continued)

9

the MRIS Database itself fails to merit copyright protection in its originality as a compilation, we reject this contention as well.[9]

In the following discussion, we first set forth the necessary statutory framework, and then consider each of AHRN's arguments in turn. Although the arguments present novel questions, we ultimately reject both.

A.

In general, the Copyright Act protects "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102. This protection commences as soon as the original work is created and fixed in some tangible form, becoming the

---

original work of art because the author was required to make such creative decisions as placement of Oscar Wilde in front of the camera, selection of the angle, light and shade, etc.).

[9] As the Supreme Court has made clear, it is only a "narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent" so as to render the work "incapable of sustaining a valid copyright." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 359 (1991). Furthermore, originality is usually considered a question of fact, Craigslist, Inc. v. 3Taps Inc., 2013 WL 1819999, at *6 n.11 (N.D. Cal. April 30, 2013) (citations omitted); thus, we may reverse the district court's finding here only if it is clearly erroneous--which it is not.
We also question the relevance of this issue to our present inquiry. Our review is limited by the scope of the revised preliminary injunction order, which reaches the issue of copyright infringement only as to the photographs contained in the database.

author's property immediately upon fixation. See id. § 201(a). Copyright ownership takes the form of several exclusive rights, such as the right to reproduce the work. Id. § 106. Although ownership vests initially with the author of the work, the author may transfer any of the exclusive rights attendant to copyright ownership by granting an assignment or exclusive license. Id. § 201(d). A copyright owner may seek judicial enforcement of his property rights against subsequent infringers, so long as he has registered the work with the Copyright Office prior to filing the copyright infringement action. Id. § 411(a).

One type of "original work of authorship" protected under the Copyright Act is a "compilation," which is "formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." Id. § 101. The protection afforded to a compilation is independent of any protection that might be afforded to its individual components. Thus, ownership of the copyright in a compilation, standing alone, "extends only to the material contributed by the [compilation's author] . . . and does not imply any exclusive right in the preexisting material." Id. § 103(b).

As relevant here, compilations made up of individual components which are themselves copyrightable are called "collective works."  A collective work is:

> a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions constituting separate and independent works in themselves, are assembled into a collective whole.

Id. § 101.  The copyright in individual component works need not be owned by the author of the collective work.  See id. § 201(c) ("Copyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution.").  Indeed, the Copyright Act establishes a default presumption that the author of a collective work does not own the copyright in any component part:

> In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series.

Id. § 201(c) (emphasis added).  However, this statutory language clearly states that where, as MRIS alleges here, the author of a collective work has obtained the express transfer of the copyrights in each separate contribution to that collective work, Section 201(c)'s presumption of distinct ownership in the collection's component works does not apply.

12

B.

We turn now to the first question presented: whether MRIS has failed to register its interest in the individual photographs with the Copyright Office prior to filing suit for copyright infringement as required by the Copyright Act. If AHRN is correct, and the registrations obtained by MRIS do not cover the photographs themselves, MRIS may not assert infringement of those photographs by AHRN in this action. See 17 U.S.C. §§ 409, 411(a); Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 157-58 (2010).

It is uncontested that MRIS filed registration applications with the Copyright Office for the copyrighted material in the Database under the regulations governing automated databases, and attained corresponding certificates of registration. However, the parties dispute the scope of those registrations. AHRN argues that MRIS's "failure to identify names of creators and titles of individual works as required by 17 U.S.C. § 409(2) and (6) limits the registration[s] to the Database itself" and therefore that "the registration[s] do[] not extend to the individual elements in the Database." Appellant's Br. at 42. MRIS disagrees, pointing to its indication on the registration applications that its Database consists of pre-existing photographic works, and emphasizing the lack of any specific statutory requirement that an automated database registration

13

list the names and authors of component works in order to effectively register copyright ownership in those component works. For the reasons that follow, we agree with MRIS.

Section 409 of the Copyright Act provides that an application for registration of a compilation "shall be made on a form prescribed by the Register of Copyrights and shall include," as relevant here, the name of the author or authors, the title of the work, and "an identification of any preexisting work or works that it is based on or incorporates, and a brief, general statement of the additional material covered by the copyright claim being registered." 17 U.S.C. § 409. As applied to a collective work whose author has also acquired the copyrights in individual component works, the text of Section 409 is ambiguous at best. Some additional guidance is provided in Section 408, which permits the Register of Copyrights to ease the burden on claimants of collective works by promulgating regulations to allow "for particular classes . . . a single registration for a group of related works." Id. § 408(c)(1); see also Kay Berry, Inc. v. Taylor Gifts, Inc., 421 F.3d 199, 205 (3d Cir. 2005) (explaining that the Copyright Act's provision for group registration is "based on Congress's desire to liberalize the registration process") (citing H.R. Rep. No. 94-1476, at 154 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5770).

14

Pursuant to its authority under Section 408(c)(1), the Register has promulgated rules allowing for group registration of certain categories of collective works: automated databases, related serials, daily newspapers, contributions to periodicals, daily newsletters, and published photographs. 37 C.F.R. § 202.3(b)(5)-(10). The provision utilized by MRIS for its quarterly registrations of the MRIS Database permits a single registration to be made "for automated databases and their updates or other derivative versions that are original works of authorship." Id. § 202.3(b)(5)(i). Under this provision, the author of an automated database may file a single application covering up to three months' worth of updates and revisions, so long as all of the updates or revisions (1) are owned by the same copyright claimant, (2) have the same general title, (3) have a similar general content, including their subject, and (4) are similar in their organization. Id. Each registration must also comply with certain notice, publication, and deposit formalities. Id. As in the text of the statute, nothing in 37 C.F.R. § 202.3(b)(5) or any related regulation specifically requires MRIS to list the name and author of every component photograph it wishes to register as part of an automated database registration.

Lacking clear statutory guidance on the matter, courts have disagreed on how to apply the Copyright Act's registration

15

requirement to collective works and their component parts. Some courts have barred infringement suits to protect copyrighted component works for failure to comply with Section 409's pre-suit registration requirement where the authors of those component works were not listed in the application to register the collective work. See, e.g., Muench Photography, Inc. v. Houghton Mifflin Harcourt Publ'g Co., 712 F. Supp. 2d 84, 94 (S.D.N.Y. 2010) ("[A]sking the Court flatly to ignore the requirement that the authors' names be listed . . . goes a bridge too far" in the context of automated databases); Bean v. Houghton Mifflin Harcourt Publ'g Co., 2010 WL 3168624, at *4 (D. Ariz. Aug. 10, 2010) (holding that registrations of collective works containing numerous photographs by different photographers, all of whom assigned their rights to the collective work author prior to his registration, were insufficient to permit each photographer to sue for copyright infringement); Alaska Stock, LLC v. Houghton Mifflin Harcourt Publ'g Co., 2010 WL 3785720, at *4 (D. Ala. Sept. 21, 2010) (adopting approach taken in Bean and Muench in holding that registration of CD-ROMS as automated databases did not effect registration of the copyrights in the individual images that comprise the databases).

On the other hand, some courts have recognized collective work registrations as sufficient to permit an infringement

16

action on behalf of component works, at least so long as the registrant owns the rights to the component works as well.  See, e.g., Craigslist v. 3Taps, 2013 WL 1819999, at *9 ("Craigslist's registration of the collective work (the overall Craigslist website and database) served to register component works to which Craigslist has an exclusive license, despite the omission of individual authors from the registration application."); Am. Inst. of Physics v. Schwegman Lundberg & Woessner, P.A., 2012 WL 3799647, at *2 (D. Minn. July 2, 2012) (concluding that plaintiffs' registration of journals as collective works was sufficient to satisfy the pre-suit  registration requirement vis-à-vis the individual articles contained in the journals, where the plaintiffs also owned (or exclusively licensed) the copyrights to those articles); Pac. Stock, Inc. v. Pearson Educ., Inc., 2012 WL 93182, at *5 (D. Haw. Jan. 11, 2012) (concluding that defendant failed to show plaintiff had not validly registered its copyright interest in component works, given the lack of specificity in the Copyright Act); Masterfile Corp. v. Gale, 2011 WL 4702862, at *2 (D. Utah Oct. 4, 2011) (finding that "[b]ecause [plaintiff] owns the constituent parts of the collection the registration of the collection extends copyright protection to the constituent parts") (citation omitted).

We find this latter approach more consistent with the statutory and regulatory scheme.[10]  Indeed, as for the trend embodied in the former group of cases, "[t]he Copyright Office is optimistic that those decisions will be overturned on appeal."  Final Rule, Deposit Requirements for Registration of Automated Databases That Predominantly Consist of Photographs, 77 Fed. Reg. 40268, 40270 (July 9, 2012).  Bean, in particular, is factually inapposite because it addresses the distinct issue of whether individual photographers may use a third party's collective work registration to satisfy their pre-suit registration requirement against subsequent infringers.

Here, MRIS owned the copyright in each of the thousands of component photographs that had been transferred to MRIS prior to

---

[10] Notably, the government's amicus brief in the appeal of Bean currently pending before the Ninth Circuit explains the Department of Justice's position that, "if the author of a collective work is also the author of the component works, or if the authors of the component works transfer all rights in the works to him, the author of the collective work may claim a copyright in the component works that make up the collective work," even where the registration for the collective work fails to identify the author and title of each component work.  See J.A. 378 (citing 17 U.S.C. § 201(d)).  The amicus brief points to Circulars issued by the Copyright Office, in which "the Copyright Office has consistently taken the position that the registration of a collective work also registers any independently copyrightable works within the collective work-- referred to here as 'component works'--in which the claimant owns all rights, even if the registration application does not specify the titles and authors of the component works."  Id. at 380.

18

its automated database registrations--as we will discuss further in Part C.  In each registration, MRIS listed photographs as the basis for its updated claim.  As the court articulated in Craigslist v. 3Taps, "it would be . . . [absurd and] inefficient to require the registrant to list each author for an extremely large number of component works to which the registrant has acquired an exclusive license."  2013 WL 1819999, at *10 (internal citation and quotation marks omitted).  Adding impediments to automated database authors' attempts to register their own component works conflicts with the general purpose of Section 409 to encourage prompt registration, see U.S. Copyright Office, Circular No. 1, 7: Copyright Basics (2012), and thwarts the specific goal embodied in Section 408 of easing the burden on group registrations, see Kay Berry, 421 F.3d at 204.

Before concluding our analysis, we discuss one recent regulatory change, though the parties did not clearly address it.  In 2012 the Copyright Office promulgated, after notice and comment, a final rule amending the regulations governing the deposit requirement applicable to databases primarily composed of photographs.  See Final Rule, Deposit Requirements for Registration of Automated Databases That Predominantly Consist of Photographs, 77 Fed. Reg. 40268 (July 9, 2012).  Under the new rule, effective August 8, 2012, "when a registration is made for a database consisting predominantly of photographs, and the

copyright claim extends to the individual photographs themselves, each of those photographs must be included as part of the deposit accompanying the application." Id. at 40270. "Identifying portions and a descriptive statement will no longer constitute a sufficient deposit." Id.[11] However, this amended regulation was not in effect at the time of MRIS's registrations in this case, at which point no such requirement existed for group registration of photographic component works. We will not find MRIS's compilation registrations inadequate for failing to comply with later-added requirements. Furthermore, we note that neither the Copyright Office nor the district court has determined that the MRIS Database consists predominantly of photographs, and we decline to undertake that decision here.

For these reasons, we endorse the district court's conclusion that "MRIS's identification of 'photographs' . . . as preexisting material and the basis of the copyright claims in its copyright registrations" satisfied Section 409's pre-suit registration requirement. See 888 F. Supp. 2d at 706-07. Consequently, MRIS is not barred from asserting infringement of

---

[11] The final rule implements this change by adding "automated databases that consist predominantly of photographs" to the list of applications for which registrants are required to provide all photographs covered by a registration as part of the deposit. See 37 C.F.R. § 202.20(c)(2)(xx) (as amended August 8, 2012).

20

its copyrighted photographs, which were registered as component works in its automated database registrations, in the present action.

C.

Having determined that MRIS satisfied its pre-suit registration requirement, we turn finally to AHRN's challenge to the merits of MRIS's copyright infringement claim. MRIS must prove two elements to establish copyright infringement: (1) ownership of a valid copyright; and (2) AHRN's copying of constituent elements of the work that are original. See Feist, 499 U.S. at 361. As AHRN does not dispute the second element on appeal, we need address only copyright ownership. Specifically, AHRN argues that a subscriber's electronic agreement to MRIS's TOU does not operate as an assignment of rights under Section 204 of the Copyright Act. MRIS responds that an electronic transfer may satisfy Section 204's writing and signature requirements, particularly in light of the later-enacted Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), 15 U.S.C. § 7001 et seq., effective October 1, 2000. We agree.

A transfer of one or more of the exclusive rights of copyright ownership by assignment or exclusive license "is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the

21

owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a) (emphasis added); see also 3 Nimmer on Copyright § 10.03[A][1].  Section 204(a) is intended "'to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses [or transfers].'"  SCO Group, Inc. v. Novell, Inc., 578 F.3d 1201, 1211 (10th Cir. 2009) (quoting Eden Toys, Inc. v. Florelee Undergarment Co., 697 F.2d 27, 36 (2d Cir. 1982)).  The signed writing requirement also serves the purpose of "enhanc[ing] predictability and certainty of ownership--Congress's paramount goal when it revised the Act in 1976."  Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 557 (9th Cir. 1990) (internal quotation marks omitted); cf. Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 412 (7th Cir. 1992) (Copyright Act "make[s] the ownership of property rights in intellectual property clear and definite, so that such property will be readily marketable").

Significantly, Section 204(a)'s signed writing requirement "is in fact different from a statute of frauds."  Lyrick Studios, Inc. v. Big Idea Prods., Inc., 420 F.3d 388, 391 (5th Cir. 2005) (citing Konigsberg Int'l, Inc. v. Rice, 16 F.3d 355, 357 (9th Cir. 1994)).  "Rather than serving an evidentiary function and making otherwise valid agreements unenforceable, under § 204(a) a transfer of copyright is simply not valid without a writing."  Id. (citation and internal quotation marks

22

omitted). Courts have elaborated that a qualifying writing under Section 204(a) need not contain an elaborate explanation nor any particular "magic words," Radio Television Espanola S.A. v. New World Entm't, Ltd., 183 F.3d 922, 927 (9th Cir. 1999), but must simply "show an agreement to transfer copyright." Lyrick Studios, 420 F.3d at 392 (citation omitted).

Before delving into the E-Sign Act and the sufficiency of the transfer here, we note one initial consideration deriving from the particular relationship of these parties. Courts have held that, in situations where "the copyright [author] appears to have no dispute with its [assignee] on this matter, it would be anomalous to permit a third party infringer to invoke [Section 204(a)'s signed writing requirement] against the [assignee]." Eden Toys, 697 F.2d at 36; see also Radio Television, 183 F.3d at 929 (adopting the rule of Eden Toys, and listing other cases to do so). Put another way, Section 204(a) "was intended to resolve disputes between owners and alleged transferee[s], and was not intended to operate for the benefit of a third-party infringer when there is no dispute between the owner and transferee." Kindergartners Count, Inc. v. Demoulin, 249 F. Supp. 2d 1214, 1221 n.22 (D. Kan. 2003) (internal quotation marks omitted). Although MRIS did not raise this argument, we nevertheless feel compelled to note the anomaly of allowing AHRN to fabricate for its own benefit a dispute between

23

MRIS and its subscribers over copyright ownership in the photographs.

The issue we must yet resolve is whether a subscriber, who "clicks yes" in response to MRIS's electronic TOU prior to uploading copyrighted photographs, has signed a written transfer of the exclusive rights of copyright ownership in those photographs consistent with Section 204(a). Although the Copyright Act itself does not contain a definition of a writing or a signature, much less address our specific inquiry, Congress has provided clear guidance on this point elsewhere, in the E-Sign Act.

The E-Sign Act, aiming to bring uniformity to patchwork state legislation governing electronic signatures and records, mandates that no signature be denied legal effect simply because it is in electronic form. 15 U.S.C. § 7001(a)(1). Additionally, "a contract relating to such transaction may not be denied legal effect, validity, or enforceability solely because an electronic signature or electronic record was used in its formation." Id. § 7001(a)(2). The E-Sign Act in turn defines "electronic signature" as "an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record." Id. § 7006(5).

24

Although the E-Sign Act states several explicit limitations, none apply here. The Act provides that it "does not . . . limit, alter, or otherwise affect any requirement imposed by a statute, regulation, or rule of law . . . <u>other than</u> a requirement that contracts or other records be written, signed, or in nonelectric form[.]" <u>Id.</u> § 7001(b). Because Section 204(a) requires transfers be "written" and "signed," a plain reading of Section 7001(b) indicates that Congress intended the provisions of the E-Sign Act to "limit, alter, or otherwise affect" Section 204(a).

Furthermore, 15 U.S.C. § 7003 specifies types of contracts or records to which the provisions of Section 7001 shall not apply. <u>See</u> <u>id.</u> § 7003(a)-(b) (excepting, <u>inter alia</u>, "statutes . . . governing the creation and execution of wills, codicils, or testamentary trusts"; "adoption, divorce, or other matters of family law"; "court orders or notices, or official court documents"; and "any notice of . . . the cancellation or termination of health insurance or benefits or life insurance benefits"). Agreements to transfer exclusive rights of copyright ownership are not included in these exceptions.[12] Nor

---

[12] Section 7003 also explains that these exceptions are meant to be phased out over time as consumer protections surrounding e-signatures are bolstered. 15 U.S.C. § 7003(c)(i) ("The Secretary of Commerce . . . shall review the operation of the exceptions in subsections (a) and (b) of this section to (Continued)

25

does the enumerated list contain any "catchall" generic category into which copyright transfers might possibly fall. We decline to read in an invitation to create new exceptions piecemeal.

AHRN's proffered authorities to the contrary are inapposite. None mention the E-Sign Act; instead, AHRN points to courts which have invalidated transfers in circumstances not at all analogous--for example, where there was no written agreement, but merely one party's declaration after the fact that he had assigned his copyright interest, see Am. Plastic Equip., Inc. v. Toytrackerz, LLC, 2009 WL 902422, at *6 (D. Kan. Mar. 31, 2009), or where an e-mail purporting to transfer the relevant rights was not actually sent by the owner of the copyright interest, see McMunigal v. Bloch, 2010 WL 5399219, at *8 (N.D. Cal. Dec. 23, 2010). We do not find these cases relevant to our present inquiry.

There is little authority regarding the application of e-signatures to instruments conveying copyrights. In what appears to be the only case relying on the E-Sign Act in this context, the Southern District of Florida held that the conveyance of a copyright interest by e-mail was valid. See Vergara Hermosilla v. Coca-Cola Co., 2011 WL 744098, at *3 (S.D. Fla. Feb. 23,

---

evaluate, over a period of 3 years, whether such exceptions continue to be necessary for the protection of consumers.").

26

2011), aff'd by per curiam opinion, 446 F. App'x 201 (11th Cir. Nov. 3, 2011). In its brief analysis of the issue, that court relied on the purpose of Section 204, which is to "resolve disputes between copyright owners and transferees and to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or copyright ownership," not to be "unduly burdensome" or to "necessitate[] protracted negotiations nor substantial expense." Id. (citations and internal quotations omitted). The court reasoned that allowing the transfer of copyright ownership via e-mail pursuant to the E-Sign Act accorded with, rather than conflicted with, this purpose.

Additionally, courts have held that agreements reached by electronic means are not invalid pursuant to analogous statutory requirements. For example, the Federal Arbitration Act (the "FAA") specifies that its protections for arbitration agreements pertain only to a "written provision" in any contract. 9 U.S.C. § 2. Courts have uniformly applied the E-Sign Act to subsequent interpretations of the FAA's written provision requirement. See, e.g., Campbell v. Gen. Dynamics Gov't Sys. Corp., 407 F.3d 546, 556 (1st Cir. 2005) ("[The E-Sign Act] definitively resolves the issue . . . as to whether an e-mail agreement to arbitrate is unenforceable under the FAA because it does not satisfy the FAA's 'written provision' requirement, 9 U.S.C. § 2.

27

By its plain terms, the E-Sign Act prohibits any interpretation of the FAA's 'written provision' requirement that would preclude giving legal effect to an agreement solely on the basis that it was in electronic form."); Specht v. Netscape Comm'cns Corp., 306 F.3d 17, 26 n.11 (2d Cir. 2002) (assessing whether clicking to download software created enforceable agreement to arbitrate, and noting that the matter of whether "the agreement is a 'written provision' despite being provided to users in a downloadable electronic form . . . has been settled by [the E-Sign Act]," although ultimately finding that consumers' clicking "yes" in the context presented in that case did not manifest assent to license terms).

We find this analysis helpful in reaching the same conclusion in the context of the Copyright Act. To invalidate copyright transfer agreements solely because they were made electronically would thwart the clear congressional intent embodied in the E-Sign Act. We therefore hold that an electronic agreement may effect a valid transfer of copyright interests under Section 204 of the Copyright Act.[13] Accordingly,

---

[13] We make no comment (nor did the district court) as to whether the subscribers' assent to MRIS's TOU constitutes a valid agreement under generally applicable principles of contract law, or whether, as in Specht, 306 F.3d at 27, it might fail for lack of mutual assent. AHRN waived this argument by raising it for the first time in its reply brief. See McBurney (Continued)

we agree with the district court that MRIS is likely to succeed against AHRN in establishing its ownership of copyright interests in the copied photographs.

III.

For the foregoing reasons, the decision of the district court is

AFFIRMED.

---

v. Young, 667 F.3d 454, 470 (4th Cir. 2012), aff'd, 133 S. Ct. 1709 (2013).