Bergenstock v. LegalZoom.Com, Inc., 2015 NCBC 63.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
13 CVS 15686

KELLY BERGENSTOCK; CHARLES
FRANCIS JONES, JR.; BEACON
HOUSE USA INC.; WILLIAM
KENNETH BAKER, as Trustee of the
Cathryn Matthews Braly Revocable
Living Trust; NITA BRALY BAKER;
WARREN KIMBERLY BRALY;
JOSEPH McDOWELL BRALY, JR.;
BRIAN DAVID BRALY; CATHRYN
MICHELLE BRALY; MADISON
MATTHEWS; JEFFREY MATTHEWS
BAKER; MARA KATHRYN BAKER;
and SULLIVAN McDOWELL ELLIS,
a Minor, All as Beneficiaries of the
Last Will and Testament of Cathryn
Matthews Braly, on Behalf of
Themselves and on Behalf of All
Others Similarly Situated,

          Plaintiffs,

    v.

LEGALZOOM.COM, INC.,

          Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER & OPINION**

{1}    THIS MATTER is before the Court on Legalzoom.com, Inc.'s Motion to Compel Arbitration of Plaintiff Kelly Bergenstock's Claims and LegalZoom.com, Inc.'s Motion to Compel Arbitration of Newly-Added Plaintiffs' Claims ("Baker Motion") (collectively, "Motions"). For reasons explained below, the Motions are GRANTED, and the litigation is stayed pending arbitration.

*Spilman Thomas & Battle, PLLC by Nathan B. Atkinson and Margaret C. Coppley for Plaintiffs.*

*Carlton Law, PLLC by Alfred P. Carlton, Jr., and Nexsen Pruet, PLLC by R. Daniel Boyce for Defendant.*

Gale, Chief Judge.

## I.    THE PARTIES#

{2}    Plaintiff Kelly Bergenstock ("Bergenstock") is an individual that resides in Kill Devil Hills, North Carolina.

{3}    Plaintiff William Kenneth Baker ("Baker") is trustee of the Cathryn Matthews Braly Revocable Living Trust ("Braly Trust"), and a resident of Delaware.

{4}    Nita Braly Baker, Warren Kimberly Braly, Joseph McDowell Braly, Jr., Brian David Braly, Cathryn Michelle Braly, Madison Matthews, Jeffrey Matthews Baker, Mara Kathryn Baker, and Sullivan McDowell Ellis ("Braly Beneficiaries") are beneficiaries of the Last Will and Testament of Cathryn Matthews Braly ("Braly Will").  All Braly Beneficiaries reside outside of North Carolina.

{5}    Cathyn Matthews Braly ("Braly") is a nonparty who executed the Braly Will and Braly Trust, and a Certification of Trust on January 13, 2014.  On January 25, 2014, Braly died a resident of Moore County, North Carolina.  The Braly Will and Braly Trust named Baker, Braly's son-in-law, as Executor and substitute trustee upon Braly's death or incapacity.

{6}    Defendant LegalZoom.com, Inc. ("LegalZoom") is a Delaware corporation that operates a website, www.legalzoom.com.  LegalZoom has offices in Glendale, California; Mountain View, California; and Austin, Texas.

## II.    PROCEDURAL BACKGROUND

{7}    Bergenstock, Charles Francis Jones, Jr. ("Jones"), and Beacon House USA, Inc. ("Beacon House") filed their original Class Action Complaint in Wake County on December 23, 2013.

{8}    On January 31, 2014, the case was designated a mandatory complex business case and on February 5, 2014, was assigned to the undersigned.

{9} On February 14, 2014, LegalZoom moved to compel arbitration of claims based on Bergenstock's two purchases and to abate all claims already settled within the settlement class of national class action approved by the California courts, which included one of Bergenstock's purchases.

{10} On July 9, 2014, Plaintiffs filed their First Amended Class Action Complaint, adding Baker and the Braly Beneficiaries as plaintiffs. Plaintiffs seek to represent the following proposed class:

> All persons or entities within the State of North Carolina that LegalZoom charged and/or collected fees for legal services and/or document preparation. The Class does not include any persons or entities that have a legally binding arbitration provision in their contract with LegalZoom.

(First Am. Class Action Compl. ¶ 125.) Plaintiffs bring claims for unauthorized practice of law ("UPL"), unjust enrichment, and unfair and deceptive trade practices ("UDTP").

{11} Plaintiffs seek restitution of all fees paid to LegalZoom class members, together with treble recovery and reasonable attorneys' fees.

{12} LegalZoom filed its Motion to Dismiss First Amended Class Action Complaint on August 22, 2014, and the Baker Motion on September 24, 2014.

{13} By its May 15, 2015, Order & Opinion, the Court dismissed all claims based on purchases made during the period covered by the national class settlement, including all claims by Jones and Beacon House and those based on Bergenstock's first purchase.

{14} The Motions seeking to arbitrate all remaining claims are ripe for hearing after full briefing and oral argument.

## III. FACTS REGARDING AGREEMENT TO ARBITRATE

{15} The Court considers matters beyond the pleadings and looks to competent evidence to determine whether an agreement to arbitrate was reached. *Evangelistic Outreach Ctr. v. Gen. Steel Corp.*, 181 N.C. App. 723, 726, 640 S.E.2d 840, 843 (2007) (requiring competent evidence in support of a valid agreement to

arbitrate); *Capps v. Blondeau*, 2010 NCBC LEXIS 10, at *3 n.6 (N.C. Super. Ct. Apr. 13, 2010) ("[I]n determining the threshold issue of whether a mandatory arbitration agreement exists, the court necessarily must sit as a finder of fact. Accordingly, for such limited purpose, the court also may consider evidence as to facts that are in dispute.") (citing *Slaughter v. Swicegood*, 162 N.C. App. 457, 461, 591 S.E.2d 577, 580 (2004)). The Court recites the following facts relevant to the arbitration issue, taken from the pleadings and affidavits.

### A. Bergenstock's Purchases

{16} Through LegalZoom's website, Bergenstock purchased a "Trademark Plus Package" on May 11, 2010, and a "Trademark Statement of Use Extension" on August 6, 2011. (First Am. Class Action Compl. ¶¶ 86–87.)[1]

{17} At all relevant times, LegalZoom's Terms of Use and Terms of Service (collectively, "Terms") were available on its homepage and were accessible by hyperlinks throughout the website, and LegalZoom's software was structured such that a consumer must have affirmatively indicated assent to the Terms in order to make a purchase.

{18} The checkout page at the time of Bergenstock's second purchase contained language declaring, "By clicking the button, I agree to the **Terms of Service** and **User Agreement**." (Br. Supp. Mot. Compel Arbitration Pl. Kelly Bergenstock's Claims ("Bergenstock Br.") Ex. 4.) The underlining in the "**Terms of Service**" and "**User Agreement**" indicated hyperlinks leading to the full texts of each document on a different webpage within the LegalZoom website.

{19} The Terms of Service in effect at the time of Bergenstock's second purchase indicated in bold language that disputes must be resolved as described in the LegalZoom Arbitration Agreement ("Arbitration Agreement"). (Bergenstock Br. Ex. 2 ¶ 3.) The Arbitration Agreement began in paragraph nine of the Terms of Service and presented in bold and capital letters: "**DISPUTE RESOLUTION BY**

###############################################

[1] LegalZoom relies only on Bergenstock's assent to arbitration as a part of her latest purchase.

BINDING ARBITRATION." (Bergenstock Br. Ex. 2 ¶ 9.) The Terms of Use contained the same agreement in paragraph six, and one of the introductory paragraphs of the Terms of Use instructed the reader to avoid use of the site if any of the Terms of Use were not agreeable. (Bergenstock Br. Ex. 3 ¶ 6.)

{20}    Under the subheading, "**Please read this carefully.  It affects your rights**," the Arbitration Agreement details a list of disputes and claims that are subject to arbitration:

- claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory;
- claims that arose before these or any prior Terms (including, but not limited to, claims relating to advertising);
- claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and
- claims that may arise after the termination of these Terms.

(Bergenstock Br. Ex. 2 ¶ 9, 3 ¶ 6.)

{21}    Bergenstock does not allege that any inadequacy of the documents she purchased led to losses.

## B. Baker's Purchases

{22}    Between June 30, 2013, and January 11, 2014,[2] Baker, using the LegalZoom website, purchased various documents for Braly's estate planning including a "living trust, a living will, and a basic power of attorney." (Mot. Compel Arb. Newly-Added Pls.' Claims Ex. 1 ("Hartman Aff. II") ¶¶ 8–9; First Am. Class Action Compl. ¶¶ 101–02.)

{23}    Although there were some wording variations, LegalZoom's Terms and its purchase page, for the purposes of this Order & Opinion, remained substantially unchanged between Bergenstock's second purchase and Baker's purchases.

---

[2] Plaintiffs and LegalZoom disagree on the actual date of purchase, but concede that the date is not material to the current motions. (*See* Br. Supp. Mot. Compel Arb. of Newly Added Pls.' Claims 3 n.1.; Pls.' Resp. LegalZoom.com, Inc's Mot. Compel Arb. Newly Added Pls. 2 n.2.)

{24}   Before consummating his purchases, Baker was required to check a box indicating agreement to LegalZoom's Terms.  The checkout page at the relevant times contained language—in between an empty checkbox to the left and a green button to the right—declaring, "By checking this box and clicking submit, I agree to the **Terms of Service, including the arbitration provision, and the User Agreement**." (Hartman Aff. II, ¶¶ 17, 19, Exs. 1D, 1G.)

{25}   The Arbitration Agreement began in paragraph eleven of the Terms of Service and was captioned in bold and capital letters.  (Hartman Aff. II ¶ 14, Exs. 1B, 1E.)  The Terms of Use available on LegalZoom's website contained the same agreement in paragraph six and instructed the reader to avoid use of the site if any of the Terms of Use were not agreeable. (Hartman Aff. II ¶ 13, Exs. 1C, 1F.)

{26}   Section (a) of the Arbitration Agreement defines parties subject to the agreement, indicating that references to "you" includes "all authorized or unauthorized users or *beneficiaries of services or products under these Terms* or any prior agreements between us."  (Hartman Aff. II, Exs. 1B, 1E (emphasis added).)

{27}   After Braly died, Baker attempted to probate the Braly Will in Moore County, North Carolina.  The Moore County Clerk of Superior Court refused to probate the Braly Will, citing inconsistent language in the estate documents that rendered them invalid.

## IV.    ANALYSIS

{28}   The Court must first determine whether the agreements to arbitrate are governed by the Federal Arbitration Act ("FAA").  When determining whether a valid arbitration agreement exists under the terms of the FAA, "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *Cold Springs Ventures, LLC v. Gilead Sciences, Inc.*, 2014 NCBC LEXIS 10, at \*11 (N.C. Super. Ct. Mar. 26, 2014) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)); *see also Brown v. Centex Homes*, 171 N.C. App. 741, 744, 615 S.E.2d 86, 88 (2005) ("The law of contracts governs the issue of whether an

agreement to arbitrate exists.") In North Carolina, "determining whether a dispute is subject to an arbitration agreement involves 'a two-part inquiry: (1) whether the parties had a valid agreement to arbitrate, and also (2) whether the specific dispute falls within the substantive scope of that agreement.'" *Fontana v. Se. Anesthesiology Consultants, P.A.*, 221 N.C. App. 582, 588, 729 S.E.2d 80, 86 (2012) (quoting *Hobbs Staffing Servs., Inc. v. Lumbermens Mut. Cas. Co.*, 168 N.C. App. 223, 225, 606 S.E.2d 708, 710 (2005)). The party seeking to compel arbitration has the burden of proving that a valid arbitration agreement exists by mutual agreement of both parties. *Slaughter*, 162 N.C. App. at 461, 591 S.E.2d at 580.

{29} Thus, if the Court determines that the agreement is governed by the FAA, the Court first evaluates whether the parties reached an agreement to arbitrate. If so, it must inquire whether the particular claims fall within the scope of the agreement to arbitrate.

{30} The present case involves additional issues. First, Plaintiffs assert that, even if the parties otherwise agreed to arbitrate, as a matter of public policy, UPL claims should not be arbitrated. As to Bergenstock's claims, the Court must determine whether any arbitration agreement reached in connection with her second purchase is sufficiently broad to extend to claims related to her earlier purchase. As to the Baker's purchases, the Court must determine whether any agreement reached with Baker in his individual capacity also binds Baker in his capacity as trustee and the Braly Beneficiaries, who were not parties to that agreement.

## A. The Motions Are Governed by the FAA

{31} The FAA applies when "(a) a written arbitration agreement exists that covers the dispute and (b) the contract containing the arbitration provision evidences a transaction involving interstate commerce." *Capps*, 2010 NCBC LEXIS 10, at *25–26 (citing *Am. Home Assur. Co. v. Vecco Concrete Constr. Co. of Va.*, 629 F.2d 961, 963 (4th Cir. 1980)).

{32}     Plaintiffs do not argue that their purchases were not in interstate commerce, but argue that at least their UPL claims are exclusively matters of state law falling outside the ambit of the FAA.  Plaintiffs argue that the regulation of lawyers has traditionally fallen to the states and that federal preemption cases support their position.  (*See* Pls.' Resp. LegalZoom, Inc.'s Mot. Compel Arb. Newly Added Pls. 9–10 (citing *Ca. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 325 (1997); *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).)

{33}     LegalZoom replies that FAA's scope cannot be limited in that manner because its enactment "withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration."  (Reply Br. Supp. Mot. Compel Arb. Newly-Added Pls.' Claims 9 (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 56 (1995)).) LegalZoom invites the Court to follow the Arkansas Supreme Court, which rejected a similar argument to that which Plaintiffs advance.  *See generally LegalZoom v. McIlwain*, 429 S.W.3d 261, 265–66 (Ark. 2013).

{34}     The Supremacy Clause of the United State Constitution states that "the Laws of the United States . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  The United States Supreme Court has stated a clear policy favoring arbitration of claims and rejecting state efforts to except claims from arbitration.  It has declared that the FAA evinces a "liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  A federal statute provides that, for any contract requiring arbitration to settle a dispute arising out of that contract, the contractual arbitration provision "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2 (2014).  The United States

Supreme Court has stated that "nothing in [§ 2] suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives," *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1748 (2011), and has established a clear rule: "When state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA." *Id.* at 1747.

{35}     The North Carolina legislature has authorized a private cause of action for UPL, supplementing the regulatory authority of the courts and the State Bar. *See* N.C. Gen. Stat. § 84-10.1 (2014). The statute does not, however, evidence an intent that such claims are not subject to arbitration.

{36}     In sum, the Court finds that the FAA applies and that there is no reasoned basis to exclude UPL claims from arbitration.[3]

## B. <u>The Parties Agreed to Arbitrate Their Disputes</u>

{37}     The Motions raise the issue of whether the Internet-based transaction is adequate to represent an agreement to arbitrate despite the absence of an agreement to which the parties affixed actual written signatures.

{38}      In evaluating this issue, the Court has considered a line of federal decisions, which have analyzed both "clickwrap" or "click-through" agreements and "browsewrap" agreements. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 428–29 (2d Cir. 2004). The critical issue in those cases was whether the Internet-based purchase was structured so that the purchaser necessarily had actual or constructive notice of the terms of use which included an agreement to arbitrate. *See, e.g.*, *Van Tassel v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011) (reasoning that the determination of whether a contract is valid "depends on whether the user has actual or constructive knowledge of a website's terms and conditions").

######################################## #########
[3] The Court expresses no opinion on the State Bar's regulatory authority over LegalZoom.#

{39}  In general, a clickwrap agreement requires that a user manifest assent to certain contractual terms by "click[ing] on an 'I agree' box after being presented with a list of terms and conditions of use." *Nguyen*, 763 F.3d at 1175–76.  Provided that those terms and conditions are clearly presented, the "clicking through" subjects the user to the rule that where "a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree." *Register.com*, 356 F.3d at 403 (citing Restatement (Second) of Contracts § 69(1)(a) (1981)).  In contrast, in a browsewrap agreement, the terms and conditions "are generally posted on the website via a hyperlink at the bottom of the screen," *Nguyen*, 763 F.3d at 1176, raising a question of whether the purchaser was aware of the terms and conditions when proceeding with the purchase.  Because there is no "click-through" to express agreement to the terms, the purchaser might proceed without visiting the webpage containing the specific terms of the agreement or without actual or constructive knowledge of those terms.  *See id.* ("The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." (quoting *Be In, Inc. v. Google Inc.*, No. 12-CV-03373-LHK, 2013 U.S. Dist. LEXIS 147047, at *23 (N.D. Cal. Oct. 9, 2013))).  In those instances, there must be separate evidence of the purchaser's actual or constructive knowledge of the terms regarding arbitration. *Id.*

{40}  The process to make a purchase using LegalZoom's website is akin to a clickwrap agreement, where it is clear that the user has actual or constructive knowledge that the purchase is subject to an agreement to arbitrate because the purchase can only proceed after acknowledging those terms.  The unrebutted evidence is that Plaintiffs were required to acknowledge assent to the Terms by clicking a button that indicated assent next to links that would have called up either of the Terms in written form.  Bergenstock had to click an "Agree and Place Order" button directly next to a statement that indicated that the clicking of that

button would indicate her consent to the Terms. When Baker made his purchase, the website had been modified to include placing a checkmark in an empty box to expressly indicate acceptance of the Terms. Both Bergenstock and Baker were advised that they should not complete their purchase if they did not agree to the Terms.

{41}    Even so, Plaintiffs argue that LegalZoom still has not met its burden to produce evidence of the signed agreement in an allowable form under the E-Sign Act, which provides that, "a signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form," and a contract is not to be denied legal effect "solely because an electronic signature was used in its formation." 15 U.S.C. § 7001(a)(1), (2) (2014); *cf.* N.C. Gen. Stat. § 66-317 (2014). "[N]otwithstanding subsection (a)," the validity or enforceability of an electronic record or contract "may be denied if . . . not in a form that is capable of being retained and accurately reproduced for later reference by all parties or persons who are entitled to retain the contract or other record." 15 U.S.C. 7001(e); *cf.* N.C. Gen. Stat. § 66-318.

{42}    However, neither the E-Sign Act nor the FAA require LegalZoom to produce evidence of Plaintiffs' actual signatures. While agreements to arbitrate must be in writing, they do not have to be signed. *Howard v. Oakwood Homes Corp.*, 134 N.C. App. 116, 120, 516 S.E.2d 879, 882 (1999). The E-Sign Act mandates that, if any law requires an original record of a transaction or contract related to a transaction, that requirement is met by retaining an accurate record of the information in a manner that is accessible and capable of being reproduced. *See* 15 U.S.C. §§ 7001(d)(1), (3) (2014); *cf.* N.C. Gen. Stat. § 66-322.

{43}    In opposition, Plaintiffs rely heavily on two cases in which the parties produced no signed agreement, and the courts denied the motions to compel arbitration. In *Slaughter v. Swicegood*, the original signor of the agreement was deceased, and the parties opposing arbitration introduced affidavits indicating their lack of awareness of the arbitration agreement. 162 N.C. App. at 457, 591 S.E.2d at 577. In affirming the trial court's refusal to find a binding arbitration agreement,

the North Carolina Court of Appeals noted that no one testified to having witnessed the signing of the agreement; no one explained why the agreement was scanned into the system eleven years after it was allegedly signed; and no one presented any evidence as to "the general business practices surrounding the signing of similar customer agreements, or whether it was the usual policy of [the opposing parties] to require prospective clients to sign such agreements." *Id.* at 462, 591 S.E.2d at 581. In *Capps v. Blondeau*, the Hon. John R. Jolly refused to find a binding agreement based on unauthenticated, "scanned and electronically stored copies and specimens" without further evidence of an actual agreement. 2010 NCBC LEXIS 10, at *36.

{44} These two cases are inapposite because, in contrast to *Slaughter* and *Capps*, LegalZoom here has provided unrebutted testimony that the process in place at the time of Plaintiffs' purchases required them to make the purchases by simultaneously acknowledging agreement with the Terms, which included an agreement to arbitrate. Further, LegalZoom has provided copies of the Terms, including the agreement to arbitrate, that were in place at the time of Plaintiffs' purchases. This evidence is the type that the court noted was missing in *Slaughter*, and the lack of which prevented the agreement's authentication in *Capps*.

{45} In sum, by "clicking through" under these circumstances, Bergenstock and Baker are deemed to have signed the agreement to arbitrate. *See Metro. Regional Info. Servs., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d. 591, 601–03 (4th Cir. 2013) (finding that one who clicks "yes" has made a written signature under E-Sign Act). LegalZoom has met its burden under the FAA and E-Sign Act to demonstrate written evidence of the agreement to arbitrate and Plaintiffs' actual agreement to arbitrate, and the Court finds that Bergenstock and Baker agreed to arbitrate claims within the scope of the arbitration agreement.

## C. The Arbitration Agreement Reaches Each of Plaintiffs' Claims

{46} Plaintiffs argue that only Bergenstock's last purchase included the Terms on which LegalZoom relies in seeking to compel arbitration of Bergenstock's claims, and there is then no basis on which to require arbitration of her earlier

purchase, which did not include such terms.  Plaintiffs also argue that Baker is suing in his capacity as trustee, whereas his purchase was made in his individual capacity, and that any agreement he made individually does not bind either Baker as trustee or the Braly Beneficiaries, who were not signatories to any agreement to arbitrate.

{47}    The general rule in North Carolina is that if "the language of the arbitration clause is 'clear and unambiguous,' [the Court] may apply the plain meaning rule to interpret its scope." *Fontana*, 221 N.C. App. at 588–89, 729 S.E.2d at 86.  However, "a party cannot be forced to submit to arbitration of any dispute unless he has agreed to do so." *Raspet v. Buck*, 147 N.C. App. 133, 136, 554 S.E.2d 676, 678 (2001) (citing *AT&T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643 (1986)).

### 1. Claims Based on Bergenstock's Earlier Purchase Are Subject to the Agreement to Arbitrate Made as a Part of Her Subsequent Purchase

{48}    The Terms of Service governing Berkenstock's last purchase provided that the agreement to arbitrate extends to "all disputes and claims," including "claims that arose before these or any prior Terms" were in effect.  (Bergenstock Br. Ex. 2 ¶ 9(a).)

{49}    The Court has concluded that Bergenstock agreed to this provision. The language is clear.  As a result, the language of the agreement to arbitrate entered as a part of Bergenstock's last purchase extends to her claims on any prior purchase.

### 2. All Claims of Baker and the Braly Beneficiaries Are Subject to Baker's Agreement to Arbitrate

{50}    Paragraph 11 of the Terms of Service applicable to Baker's purchase states that "references to 'LegalZoom,' 'you,' and 'us' include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of services or products under these Terms or any prior agreements between us."  (Hartman Aff.

II Exs. 1B, 1E.) On its face, this language is sufficiently broad to reach Baker, whether claiming individually or as trustee, and the Braly Beneficiaries. The question remains whether the language, although clear, binds only signatories to the agreement.

{51} "The obligation and entitlement to arbitrate 'does not attach only to one who has personally signed the written arbitration provision.' Rather, 'well-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties.'" *Ellen v. A.C. Schultes of Md., Inc.*, 172 N.C. App. 317, 320, 615 S.E.2d 729, 732 (2005) (quoting *Wash. Square Sec., Inc. v. Aune*, 385 F.3d 432, 435 (4th Cir. 2004)). Stated otherwise, a party is not allowed simultaneously to claim the benefit of the contract while denying the arbitration agreement contained in that contract. *See Carter v. TD Ameritrade Holding Corp.*, 218 N.C. App. 222, 231, 721 S.E.2d 256, 263 (2012); *see also Ellen*, 172 N.C. App. at 320–23, 615 S.E.2d at 731–33.

{52} In *Carter v. TD Ameritrade Holding Corp.*, the plaintiff investors sued for losses in their IRA accounts. 218 N.C. App. at 223–24, 721 S.E. 2d at 258–59. They claimed that their signatures on the IRA agreements containing the arbitration provisions had been forged and that they had not agreed to those provisions. *Id.* In reaching its decision, the court of appeals noted that, in order to determine whether the plaintiffs were bound to the arbitration clause, its appropriate inquiry is to "examine whether the plaintiff has asserted claims in the underlying suit that, either literally or obliquely, assert a breach of a duty created by the contract containing the arbitration clause." *Id.* at 231, 721 S.E.2d at 263 (quoting *Am. Bankers Ins. Grp. v. Long*, 453 F.3d 623, 629 (4th Cir. 2006)). Having found that the plaintiffs had clear knowledge of the existence of the IRA contracts, the court concluded that although the complaint essentially asserted only tort claims, those claims derived from and were dependent on duties arising from the contracts establishing the IRAs, and as a result, the plaintiffs were estopped from denying the arbitration agreements. *Id.* at 232, 721 S.E.2d. at 264. As to statutory

claims under state securities laws, the court of appeals concluded that, "[a]t the very least, plaintiffs' complaint 'obliquely[] assert[s] a breach of a duty created by the contract[s] containing the arbitration clause[s].'" *Id.* at 233, 721 S.E.2d at 264 (first alteration added) (quoting *Long*, 453 F.3d at 629). The court indicated that a significant inquiry is whether the plaintiff would have a claim but for the existence of the contract including the arbitration clause. *See id.* at 232, 721 S.E.2d at 264.

{53}   In *Ellen v. A.C. Schultes of Maryland, Inc.*, the plaintiffs, who were shareholders of a subcontractor, asserted UDTP and tortious interference claims arising from a course of conduct by a general contractor that included improper sexual advances, unethical business practices, slanderous statements to the subcontractor's clients, and other acts that ultimately led to the damage to the plaintiffs' business and reputation. 172 N.C. App. at 318–19, 615 S.E.2d at 730–31. The general contractor and subcontractor were parties to a series of contracts containing an arbitration clause. *Id.* at 317–18, 615 S.E.2d at 729. The general contractor sought to compel arbitration against the shareholders. *Id.* at 320, 615 S.E.2d at 729. The court refused to compel arbitration, finding that

> plaintiffs are not seeking any direct benefits from the contracts containing the relevant arbitration clause, nor are they asserting any rights arising under the . . . contracts. Neither plaintiffs' allegations of unfair and deceptive trade practices nor plaintiffs' allegations of tortious interference depend upon the contracts containing the arbitration clause. Both of the claims are dependent upon legal duties imposed by North Carolina statutory or common law rather than contract law.

*Id.* at 322, 615 S.E.2d at 733.

{54}   Baker in his capacity as trustee and the Braly Beneficiaries urge that, as nonsignatories, they should not be bound to any agreement to arbitrate because they neither received a direct benefit under Baker's purchase from LegalZoom nor assert rights under that purchase contract. However, their harm, if any, arises directly as a result of Baker's purchase from LegalZoom. But for that purchase, Plaintiffs would have no claim. As such, the Court concludes that the holding in *Carter* is controlling, because "[a]t the very least, plaintiffs' complaint 'obliquely[]

assert[s] a breach of a duty created by the contract[s] containing the arbitration clause[s].'" 218 N.C. App. at 233, 721 S.E.2d at 264 (first alteration added) (quoting *Long*, 453 F.3d at 629).

{55} The Court concludes that the claims of Baker in his capacity as trustee and of the Braly Beneficiaries are subject to Baker's valid agreement to arbitrate.

## V. CONCLUSION

{56} As such, the Court finds as a fact that Bergenstock and Baker agreed to arbitrate claims arising from their purchases. The Court finds as a fact that Bergenstock agreed that she would arbitrate claims arising from any purchase from LegalZoom. The Court finds as a fact that the arbitration clause involved in Baker's purchase includes claims by Baker acting as trustee and by the Braly Beneficiaries.

{57} Based on these facts, the Court concludes that each of the claims in the litigation are subject to arbitration and the case should be stayed pending arbitration.

{58} Defendant's Motions are GRANTED.


This the 23rd day of June, 2015.


/s/ James L. Gale
James L. Gale
Chief Special Superior Court Judge
  for Complex Business Cases